[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
This dissolution proceeding was returned to court on July 18, 1995. The plaintiff Andrea V. DeLucia sought: 1) a dissolution of the marriage; 2) alimony either by way of periodic payments or lump sum or both; 3) an order transferring the defendant's interest in and to the real estate located at 616 Windsor Court, Cheshire, Connecticut; 4) an equitable division of the personal property; 5) an equitable assignment of the real and personal property of the parties; 6) counsel fees; 7) such other and further relief as the court deems just and proper. The defendant Joseph DeLucia filed an answer on July 13, 1995 admitting paragraphs 1 through 7 of the complaint and filing a cross complaint seeking a dissolution of the marriage, a conveyance of the plaintiff's right, title and interest in real property located at 616 Windsor Court, Cheshire, Connecticut; settlement of all real and personal property between the parties and all other relief in law or in equity in which the court may find the defendant entitled.
On September 21, 1995, the parties entered into an agreement which was approved by the court requiring the defendant to pay alimony pendente lite to the plaintiff in the amount of $1000 per week, effective September 21, 1995, and requiring the plaintiff to be solely responsible for the payment of all operating expenses of the jointly owned real estate located at 616 Windsor Court, Cheshire, Connecticut. The agreement also permitted the CT Page 425 plaintiff to have exclusive use of the family home and required the plaintiff to maintain health insurance for the benefit of the defendant as available through her place of employment. Both parties agreed that they would not transfer or liquidate any of their assets. The defendant agreed to nominate the plaintiff as an irrevocable beneficiary on his $300,000 life insurance policy with the State Mutual Insurance Company. In addition the defendant agreed to pay certain outstanding bills on behalf of the plaintiff. The parties then proceeded to extensive discovery and depositions of various experts.
Because the parties were unable to agree on the final disposition of their property; trial commenced on November 5, 1996, and continued for approximately seven days. The court finds that the parties intermarried in Cheshire, Connecticut, on October 24, 1980. It was the first marriage for the plaintiff and the second marriage for the defendant. Both parties have resided continuously in the state for at least twelve months immediately preceding the date of the filing of the complaint. Both parties have alleged in their pleadings that the marriage has irretrievably broken down and the court so finds. No minor children issue of the marriage were born during the course of the marriage.
The parties were reasonably happy during the marriage until about July of 1994 when the husband became infatuated with another woman. At the commencement of the marriage, the plaintiff undertook to complete her education. She attended college full-time for about two years and obtained a degree. The defendant paid for her tuition and her expenses associated with the completion of her undergraduate education. Shortly after graduation, she took a full-time position as a sales representative for a large drug firm.
She is still employed by the firm, earns approximately $55,000 a year and enjoys various company benefits such as the use of a company car, health insurance, pension plan, employee savings and a 401(K) plan. Shortly after the marriage, plaintiff assumed the role as the primary caregiver to defendant's three daughters. By every account, she was a good and generous mother with an essentially healthy relationship to the three daughters. She was particularly responsive to the care of the youngest girl who was affected by a depression syndrome. She continued to have a good relationship with the girls after the marriage and after the parties separated in December of 1994. CT Page 426
During the marriage, the parties had an informal economic relationship. The plaintiff did not pool her earnings with her husband's earnings but did help with the purchase of food and clothing for the girls and some furniture for the family. She also maintained health insurance for the entire family through her place of employment.
The defendant maintained his business entirely separate and in his own name. During the course of the marriage, the parties owned two dwellings, both of which were placed in the names of Andrea V. DeLucia and Joseph E. DeLucia. The defendant maintained the dwellings, paying for the mortgage, taxes, insurance and all large items used by the family although the plaintiff did purchase some furniture during the course of their marriage. The parties used the proceeds from the sale of their first dwelling to partially pay the down payment on their current dwelling, 616 Windsor Court, Cheshire, Connecticut.
The parties' family life was generally good. They dined out frequently. They were well off both economically and socially, enjoying a high standard of living with ready access to cars, vacations, extensive social life including membership in a country club. The plaintiff did not play golf or bridge but enjoyed the country club ambience. The defendant is an avid golfer. Plaintiff maintained a close relationship with defendant's parents and siblings and was a beneficiary of at least one substantial gift ($10,000 from defendant's parents).
The defendant is a pharmacist and a highly successful businessman. When the parties intermarried in 1980, he owned two pharmacies, one of which was the Cheshire Pharmacy, and had formerly owned three pharmacies. At the time of the marriage, the pharmacies conducted retail business and also sold pharmaceuticals to institutions such as nursing homes, group homes, etc., in the Cheshire, Middletown and Waterbury area. In 1992, defendant reorganized this institutional business first as a sub-Chapter S Corporation and subsequently as a C corporation. Defendant moved the business now known as Cheshire Long Term Care Pharmacy, Inc. into a building owned by the DeLucia Realty Associates Limited Partnership. Plaintiff has no legal ownership in the property known as 288 Highland Avenue, Cheshire, Connecticut. Defendant has a 25 percent interest in the partnership; his mother, brother and sister own the remainder of the partnership. Between 1980 and 1994, both the retail and CT Page 427 institutional pharmacies prospered. In 1992, reported sales for Cheshire Long Term Care were $848,560; in 1995, they were $2,738,449; and for six months in 1996, they were $2,034,804.
Reported sales for Cheshire Pharmacy in 1992 were $1,901,204; for 1995, they were $1,952,940; and for the six months of 1996, they were $952,616.
Although plaintiff worked part-time for a year or two in the Cheshire Pharmacy immediately after her marriage, she had no part in the management of the business of either the pharmacy or the long-term care pharmacy nor did she contribute monetarily to the growth of either business. Nevertheless, the court will consider (1. "Whether any of the plaintiff's nonmonetary contributions to the family dwelling during the marriage made it possible for the husband to acquire or retain property and (2) Whether the wife's alleged nonmonetary contributions to the family during the marriage had the effect of preserving the value of already acquired property or appreciating the value of already acquired property." O'Neill v. O'Neill, 13 Conn. App. 300, 308 (1988). Referring to this case in Blake v. Blake, 207 Conn. 217, 231, 232
(1988), the court said, "We need not decide whether the `contribution of each of the parties in the acquisition, preservation or appreciation in value of the respective estates' includes nonmonetary contributions. Sections 46b-81(c), 46b-82
and 46b-84(b) all require that the trial court consider the `station' of each spouse."
"Station is a social standing which is strongly correlated to a standard of living which should be considered by the court in determining alimony and dividing marital property." Blake v.Blake, Id. 232. Blake is also authority for the proposition that the court must weigh the "station" or standard of living of the parties in light of other statutory factors such as length of the marriage, employability, liabilities and needs of each of the parties and the opportunity of each of the parties for future acquisition of capital assets and income.
The court is also required by § 46b-81 (assignment of property and transfer of title) to consider the length of the marriage, the cause of the dissolution, the age, health, station, occupation, amount and sources of income, vocational skills, employability, estate, liabilities and needs of the parties and the opportunity of each for future acquisition of capital assets and income. The court is also required to consider the CT Page 428 contribution of each of the parties in the acquisition, preservation and appreciation in value of their respective estates.
Section 46b-82 (Alimony) requires the court to consider all of the factors noted in § 46b-81 except the contribution of each of the parties in the acquisition, preservation or appreciation in value of the respective estates. Section 46b-82
also requires the court to consider the award if any, which the court may make pursuant to § 46b-81.
The parties had a serious dispute over the values of the Cheshire Pharmacy, Inc. and the Cheshire Long Term Care Pharmacy, Inc. The parties were also not in agreement as to the value of the family home, located at 616 Windsor Court, Cheshire, Connecticut; the value of the commercial building occupied by the Cheshire Long Term Care Pharmacy at 288 Highland Avenue in Cheshire, Connecticut, which property was owned by the DeLucia Realty Limited Partnership; the value of the rental property owned by the defendant at 1892 East Main Street, Waterbury, Connecticut.
Both parties employed experts to afford guidance to the court which is required to fix the nature and the value of the property if any to be assigned in accordance with General Statutes §46b-81.
The real properties in which the plaintiff claimed a legal or equitable interest included the family dwelling, currently occupied by the plaintiff, 616 Windsor Court, Cheshire, Connecticut, titled in the name of both parties; 1892 East Main Street, Waterbury, Connecticut, a mixed use commercial and residential building owned solely by the defendant; the defendant's 25 percent interest in DeLucia Realty Associates Limited Partnership, a commercial building in which the Cheshire Long Term Care Pharmacy conducted its business.
Plaintiff also claimed a 50 percent interest in the two corporations operated and managed by the defendant, Joseph DeLucia: Cheshire Pharmacy, Inc. and Cheshire Long Term Care Pharmacy, Inc. Mr. DeLucia owns 100 percent of the stock in the former and 85 percent of the stock in the latter.
The plaintiff also claims sole ownership in the parties' miscellaneous household furniture and personal property and a 50 CT Page 429 percent interest in the value of the parties' combined assets including bank accounts, stocks, bonds and mutual funds, deferred compensation, cash value of life insurance, IRAs, 401(K), vested pension funds, and debts due defendant from Cheshire Long Term Care Pharmacy.
After giving consideration to the testimony of these experts and the testimony of the parties, and after reviewing the videotape of the premises at 616 Windsor Court, Cheshire, Connecticut, the court finds the value of 616 Windsor Court, Cheshire, Connecticut, to be $400,000. Since it is encumbered by a mortgage of $193,574, the parties' equity is $206,426.
No expert testimony was offered on the value of the rental property located at 1892 East Main Street, Waterbury, Connecticut. Evidence submitted by the defendant owner and the plaintiff enables the court to find its fair market value is $100,000. This property is unencumbered by any mortgage. Both parties offered expert testimony on the fair market value of 288 Highland Avenue, Cheshire, Connecticut. This property is owned by DeLucia Realty Associates Limited Partnership. The defendant Joseph DeLucia owns a 25 percent interest in the partnership. The court finds the fair market value of the property is $460,000. The property is subject to a $250,000 mortgage which reduces the owner's equity to $210,000. Defendant's 25 percent equity is therefore found to be $52,500. Based on the testimony of both parties and the videotape of the interior of the family dwelling, the court finds the value of the furniture and personal property contained therein has a value of $60,000.
The experts were in disagreement about the value of the Cheshire Pharmacy, Inc. and Cheshire Long Term Care Pharmacy, Inc. Plaintiff's expert valued Cheshire Pharmacy, Inc. at $693,000 and Cheshire Long Term Pharmacy, Inc. at $2,100,000, achieving a fair market value of $1,785,000 for defendant's 85 percent ownership of this business. Defendant's expert estimated that the fair market value of Cheshire Pharmacy was $593,000, and the fair market value of 85 percent of Cheshire Long Term Care Pharmacy was $551,000.
A retail pharmacy such as the Cheshire Pharmacy faces considerable competition from chain stores and from mail order drug outlets and managed care, and the court must consider this competition in placing a value on the retail business. Retail pharmacies are going the way of corner groceries. Some are being CT Page 430 sold or merged into the giant chains such as Rite Aid, CVS, etc. Some are disappearing because the large grocery chains and discount stores provide insuperable competition. Cheshire Long Term Care Pharmacy also is in a competitive market with large nursing homes who have their own captive pharmacy operations; long-term care pharmacies must submit to governmental controls regulating the drug reimbursement levels for Medicare and Medicaid. Large hospitals are also aligning themselves with nursing homes offering to supply all necessary services to the home including institutional pharmacy. Drug companies are also entering the mail order pharmacy business.
Both experts recognized the contemporary risks inherent in the operation of both retail and institutional pharmacies and factored these risks into the capitalization rates which they used and applied to the earnings of the businesses either historical earnings or adjusted or normalized earnings. Plaintiff's expert and defendant's expert both eliminated the asset value or cost approach in computing the fair market value of Cheshire Pharmacy, Inc., the retail business. Each expert used both the market approach and the income approach to value to arrive at their ultimate values. The experts were fortunate in having available to them a bona fide offer for Cheshire Pharmacy, Inc. from Rite Aid, a large drugstore chain. Rite Aid Corporation offered $300,000 plus the value of the inventory for this business.
Plaintiff's expert valued the inventory at $200,000 and opined that the balance of other operating assets was a negative $87,000, resulting in a fair market value, using this approach, of $413,000, for Cheshire Pharmacy's operating assets, to which the expert added $280,000 for the nonoperating assets, i.e., cash value of life policy and a loan to defendant of $207,904, for a total estimated fair market value of Cheshire Pharmacy, Inc. of $693,000.
Using the same approach, the defendant's expert added the adjusted inventory which he found to be $150,856 to the purchase price and added in a positive value of $142,537 for the remaining assets to arrive at a total enterprise value for Cheshire Pharmacy, Inc. of $593,000 using the market methodology. In utilizing the income approach to value, the plaintiff's expert first adjusted the reported financial information on Cheshire Pharmacy, Inc. to better understand its earning capacity. Operating income for 1995 was adjusted from reported $92,000 to CT Page 431 an adjusted $100,000. This involved adjustments for discontinued services and reductions in officers' compensation, family salaries and expenses and also reductions in discretionary expenses based upon industry averages and the experts' value judgment. Plaintiff's expert relied on two rules of thumb regarding income and revenue commonly used in the retail pharmacy industry to arrive at what she described as the income approach to value for the Cheshire Pharmacy. These valuation multiples involve an application of a multiple to the discretionary owner's cash in one instance, and a percentage of revenue in the second instance. These rules of thumb give a value for inventory and intangible assets only, hence, are directly compatible to the market analysis derived from the Rite Aid offer, i.e., $413,000 for the operating business and $280,000 for the nonoperating assets resulting in a total $690,000 as the fair market value of the Cheshire Pharmacy, Inc.
Defendant's expert used a capitalization of earnings model utilizing a built-up method to determine the appropriate capitalization rate. To achieve net income, salary to Mr. DeLucia was adjusted to a normalized industry average and service revenues and expenses were also adjusted as were some discretionary expenses and depreciation expenses. Finally, these normalized earnings were adjusted to reflect income taxes. Using normalized earnings of $42,872 and a built-up capitalization rate of 20.33 percent, the defendant's expert derived an enterprise value from the operations of $210,880 to which he added nonoperating assets of $279,940 based on the cash surrender of a policy on defendant's life and a loan receivable from him to the corporation, thus creating a total enterprise value based upon this methodology of $490,820.
The court concludes that the fair market value of Cheshire Pharmacy, Inc. is best determined with reference to the Rite Aid offer. Based on the credible evidence, the court finds the fair market value of the Cheshire Pharmacy to be $693,000. The parties were also at issue over the fair market value of Cheshire Long Term Pharmacy, Inc. Defendant owns 85 percent of the stock in this business. The remaining 15 percent is owned by his three daughters. Here again, both experts discarded the asset or cost approach to value and utilized the market value approach and the income approach to value. Plaintiff's expert and defendant's expert both obtained access to the acquisition market for long-term care pharmacies in order to justify their respective opinions based on this methodology. CT Page 432
Plaintiff's expert adopted three categories of multiples which large national companies use in acquisitions: 1) multiple of bed size; 2) percentage of revenue; 3) multiples of earnings before depreciation, interest and taxes (EBDIT). Plaintiff's information on these three multiples came from telephone interviews with managers at three national companies actively engaged in acquisition programs (Exhibits A-8, A-9, A-43, A-49). Plaintiff estimated that Cheshire Long Term Care Pharmacy services 1,620 institutional beds at adjusted revenue of $3,053,000 and had an adjusted EBDIT of $425,000. The multiples suggest a range of $2 to $3 million for market value. The experts' value judgment put the fair market value at $2,300,000, less a holdback of 10 percent to obtain a value of $2,070,000.
Both experts use the income approach to value to obtain a value for Cheshire Long Term Care Pharmacy, after making adjustments to historical income statements. These adjustments were made to determine the future earning potential of Cheshire Long Term Care Pharmacy. Plaintiff's expert found reason to adjust for transferred services, prior sales adjustments, officers' compensation, family salaries, economic rent, cost of sales adjustment, depreciation and amortization, auto expense, discretionary expense and expensed equipment. This resulted in an increase for 1995 of reported operating income from $25,000 to an adjusted operating income of $405,000, and after tax income of $237,000. The plaintiff capitalized this income at 12 percent to arrive at a fair market value of $1,975,000. Plaintiff reconciled the market value and the income value by giving greater weight to the market value rounding it off to $2,100,000, 85 percent of which representing Mr. DeLucia's ownership is equal to $1,785,000.
Defendant's expert also sought the advice of long term care pharmacy analysis in order to establish a value for Cheshire Long Term Care Pharmacy. These analysts reported to him that acquisitions are typically made by a major player, in this case, Omni Care, at prices of four to seven times earnings before interest and taxes (EBIT). Defendant's expert assumed 1300 to 1500 long-term care patients and an EDBIT of $142,321 based upon the expert's adjustment of historical earning reports. Using a multiple of five times EBIT, the expert opined that the total enterprise market value by the market approach for Cheshire Long Term Care Pharmacy, Inc. is $712,000. CT Page 433
Defendant's expert also noted that holdbacks are customary in sales of small institutional pharmacies to the larger ones. He analyzed reports of purchases by Omni Care which indicated that sales were sometimes consummated on the basis of multiples times bed size. He reported multiples of 667-875 per bed which were much lower than those reported by plaintiff's expert.
In using the income approach, defendant's expert made similar adjustments to historical income statements although of lesser amounts to arrive at a normalized net income before taxes of $142,321 and earnings after income tax adjustment amounting to $94,821. Defendant capitalized this after tax income at 16.20 percent in order at arrive at a fair market value of $585,000 by the income approach, 85 percent of which representing Mr. DeLucia's share is $497,250 rounded to $497,000. Defendant reconciled the market approach with the income approach to arrive at an average value of $551,000.
After a review of the methodology of both experts, the court concludes that an informed buyer would probably capitalize the after tax earnings of Cheshire Long Term Pharmacy, Inc. to determine the fair market value of the business. An informed buyer would adopt a capitalization rate that would include percentage factors that recognize average market returns, ordinary and special risk premiums and a negative charge for long-term growth in earnings. It is the court's opinion based on all the credible evidence that such a capitalization rate would be 14 percent. It is apparent from the reports of both experts that an informed buyer would adjust or normalize historical earning reports to obtain earnings after taxes that would reasonably reflect the earnings potential of this business. The court's analysis of all the credible evidence indicates that an informed buyer would probably apply a capitalization rate of 14 percent to earnings after income tax adjustments of approximately of $164,000 and therefore determine a fair market value of Cheshire Long Term Pharmacy was $1,172,000 and that defendant's 85 percent ownership has a fair market value of a little over $1 million rounded to $1 million.
The plaintiff valued defendant's total estate at $2,914,409. The defendant's most recent financial affidavit lists his assets as $1,589,672 and liabilities at $277,843. The court finds that the defendant's gross estate totals $2,113,130. After deducting his liabilities not including his loan obligation to Cheshire Pharmacy, his net estate amounts to about $2,043,000. Plaintiff's CT Page 434 most recent financial affidavit dated November 5, 1996, lists assets of $157,780 and liabilities of $82,181, including attorneys' fees as of that date of $24,116. In a claim for relief dated December 19, 1996, plaintiff shows assets of $208,530. The court estimates her gross assets at approximately $240,000, giving consideration to furniture and personal effects located at her dwelling.
The defendant's net income based on his most recent financial affidavit is $1,586 weekly. Prior affidavits vary from a low of $1,478 to a high of $1,779. Defendant's 1995 Form 1040 reports total income of $134,746 or approximately $2,668 weekly gross. Plaintiff claims that the court should consider various adjustments to the corporate income of both Cheshire Pharmacy and Cheshire Long Term Pharmacy along with the personal benefits that defendant and his family receive from these corporations and add these discretionary expenses to his reported income. The court is reluctant to do this believing that this evidence is less credible than defendant's 1995 1040 reported income.
Plaintiff states that her income in 1995 was $55,197, including bonuses.
The court has examined the reports of the various experts employed by the parties and analyzed the financial affidavits and weighed the testimony of the parties and their experts and has made findings that the current value of the plaintiff's estate is approximately $240,000 and that she has present earnings of about $55,000 plus a variety of prerequisites from her employment. The court has also found that the current value of the defendant's estate is approximately $2,000,000 and that his income is approximately $134,146 annually.
The plaintiff is age 47, in good health, well educated, highly employable, steadily employed, and it appears her economic future will benefit from her social security earnings, normal appreciation of her stocks, bonds and mutual funds and her 401(K) program which has $85,692 in it at the present time. In addition to this, she has vested pension rights with her employer.
The defendant is 54 years of age, in good health, an experienced pharmacist, and the chief operating officer of two profitable businesses which should provide him with a steady income in the foreseeable future although both businesses are subject to risks which have become somewhat more acute due to the CT Page 435 rapid changes in the health care industry and consolidation of the retail pharmacy business.
The marriage lasted for approximately fourteen years to the date of separation. Although the defendant professed unhappiness in the last year or so which he attributed to the plaintiff's use of alcohol in conjunction with prescription drugs, the court cannot find that this was other than a minor cause of the breakdown of this marriage. The cause of the breakdown of the marriage was the infidelity of the defendant. As previously noted, he became infatuated with another woman, one of his employees, moved in with her and contemplates marrying her.
The plaintiff was devastated by her husband's action. Despite her efforts to preserve the marriage, the defendant resisted all efforts at reconciliation and refused to attend counseling intended to overcome the breakdown. Accordingly, the court finds the marriage has irretrievably broken down with no hope of reconciliation and is hereby dissolved.
The plaintiff was able initially to maintain her relationship with the defendant's children and other family members, but she fears that all such relationships are now in jeopardy since the separation and the contested dissolution proceedings. Although the plaintiff is an attractive, well-groomed, well-educated woman, she does not appear to have created an independent network of social activities and friends, relying for the most part on her husband for her social standing.
Giving consideration to the factors recited in § 46b-81, the court will and does hereby assign to the plaintiff the sum of $300,000 from the estate of the defendant. This sum is due and payable on or before March 3, 1997. In addition to this assignment of property, the court orders the defendant to convey to the plaintiff all his right, title and interest in and to the family home described as 616 Windsor Court, Cheshire, Connecticut. The plaintiff shall be solely responsible for the payment of all existing real estate taxes, utility charges and the existing mortgage on the premises. The plaintiff shall also be entitled to the benefits of any existing escrow account established by the mortgagee for the accrual of taxes and insurance. The court grants to the plaintiff all personal property contained in the dwelling and out buildings except for such personal property of the defendant and his daughters as the court will hereinafter designate. CT Page 436
It is difficult to quantify the nonmonetary contributions of one spouse which enables the other spouse to devote substantial time to paid employment which in turn enables the family to acquire marital assets. In this instance the plaintiff and defendant each worked and maintained their assets separately with each acquiring separate estates. Weighing the station of the parties into the equation in the light of the other statutory factors required by § 46b-81, the court considers the sum of $300,000 plus the defendant's equity of $103,000 in 616 Windsor Court, and the defendant's in the personal property located therein, an equitably appropriate award.
In its consideration of periodic alimony, the court has also considered the station of the parties which is based in part on their dwelling. The order for periodic alimony is crafted to enable the plaintiff to maintain her existing living standards giving consideration to her existing and future income potential and her existing estate supplemented by the court order pursuant to § 46b-81.
In accordance with the provisions of § 46b-82, the court orders the defendant to pay to the plaintiff in addition to the award granted to plaintiff pursuant to § 46b-81, the sum of $3000 monthly commencing January 13, 1997, and payable thereafter on the thirteenth day of each month up to and including the month of November in the year 2004. This order is nonmodifiable as to duration or amount but will terminate on the death of the plaintiff or the defendant.
Defendant shall pay to plaintiff's counsel the sum of $20,000 as attorney's fees within sixty days of judgment.
The plaintiff will execute and deliver to the defendant an agreement indemnifying him and holding him harmless from any obligation on the existing mortgage on 616 Windsor Court, Cheshire, Connecticut.
The defendant is responsible for all state and federal income tax liabilities of the parties for the calendar year 1994 and prior. The defendant shall maintain the State Mutual Insurance policy in the face amount of $300,000 owned by him with plaintiff designated as a sole beneficiary until November 30, in the year 2004. CT Page 437
The court finds that the defendant is in arrears of his alimony pendente lite obligation due December 6, 1996, and December 13, 1996, in the amount of $2000. The defendant is ordered to pay this sum and to continue with his obligation to pay alimony pendente lite until the date of this judgment.
The parties shall keep those assets other vise shown on their affidavits free and clear of all claims of the other, except for the orders herein contained.
Each party shall be solely responsible for the debts and liabilities described on their most recent financial affidavit.
The plaintiff will return to the defendant those items listed on Exhibit A attached hereto. This return shall take place within thirty days of the date of this judgment.
The plaintiff will return to the daughters of the defendant those items listed on Exhibit B attached hereto. This return shall be made to them or to their designated representatives within thirty days of the date of this judgment.
Dorsey, J. Judge Trial Referee
EXHIBIT A
List of Joseph DeLucia's items
1. CARD TABLE — GIVEN TO HIM BY HIS PARENTS
2. SKIS
3. WATERFORD CRYSTAL PITCHER (IS OWNED BY JEAN DELUCIA)
4. PERSONAL PHOTOS
5. WATERFORD CRYSTAL GLASSES (TALL COLLEEN AND BRANDY SNIFTERS)
6. GORHAM CHANTILLY SILVER
8. SILVER PURCHASED IN NEW ORLEANS
9. ROYAL DALTON CASSEROLE DISH WITH TOP (IS OWNED BY JEAN DELUCIA) CT Page 438
EXHIBIT B
RENEE, MICHELE AND ALYSON'S PERSONAL ITEMS AT 616 WINDSOR CT.
1. RENEE AND MICHELE'S GORHAM CHANTILLY SILVER.
2. RENEE AND MICHELE'S PERSONAL PHOTOS
3. RENEE AND MICHELE'S CLOTHES
4. RENEE'S PHARMACY BOOKS
5. THE FAMILY SKIS
6. MICHELE'S DESK IN OLD ROOM
7. ALL OF ALLYSON'S PERSONAL ITEMS IN OLD ROOM
8. ALLYSON'S BED AND FURNITURE IN OLD ROOM.